IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

WARING LESTER,                    :
                                  :
        Plaintiff,                :
                                  :
                                  :        CIVIL ACTION FILE NO.:
v.                                :        1:23-CV-4064-ELR-AWH
                                  :
UNITED PARCEL SERVICES,           :
INC.,                             :
                                  :
        Defendant.                :

**ORDER and FINAL REPORT AND RECOMMENDATION**

This case is before the Court on Defendant's Motion for Summary Judgment [77], Plaintiff's Motion to Strike [105], and Defendant's Notice of Objection to New Theories Asserted at Summary Judgment and Portions of Gauthier and Lester Declarations [111]. After a review of the record and due consideration, the Court enters the following Recommendation.

**Discussion**

I.      **Plaintiff's Motion to Strike [105]**

Plaintiff first moves to strike the declarations of Scott Bremerman, Danelle McCusker Rees, and Jerwin Burke. See Doc. 105. Plaintiff argues that the Bremerman and McCusker Rees declarations should be stricken because they fail to meet federal attestation requirements. See id. at 3–4. More specifically, Plaintiff argues that those declarations were not given handwritten signatures and are

1

improper as a result. Id. Plaintiff adds that the Burke declaration should be stricken because it was not made "upon personal knowledge." Id. at 4–5. Defendant argues in response that Plaintiff's motion is procedurally improper, that handwritten signatures are not required, and that Burke's declaration was proper. See Doc. 108 at 6–7.

For one, Defendant is correct generally that a motion to strike is the improper vehicle for what Plaintiff seeks. A motion to strike under Rule 12(f) relates to pleadings, which in turn are defined by the federal rules to include a complaint, an answer, an answer to a counterclaim, an answer to a crossclaim, a third-party complaint, an answer to a third-party complaint, and a reply to an answer. See Fed. R. Civ. P. (7)(a); see also Fed. R. Civ. P. 12(f). Plaintiff here expressly moved to strike "pursuant to Federal Rule of Civil Procedure 12(f)," but the declarations are not pleadings. Doc. 105 at 1. Thus, the motion is procedurally improper.

Notwithstanding its procedural shortcomings, the motion also lacks merit. First is the question of whether the Bremerman and McCusker Rees declarations needed to be hand signed. The Court agrees with Defendant that these declarations do not require a handwritten signature. See Middlebrooks v. Equifax, Inc., No. 1:20-cv-1825-SCJ-JSA, 2023 WL 2876429, at *6 (N.D. Ga. Mar. 14, 2023) ("The Court has not unearthed any Eleventh Circuit binding precedent requiring a

handwritten signature on a declaration."); see also CFPB v. Univ. Debt & Payment Sols. LLC, 1:15-cv-0859-RWS, 2019 WL 1295004, at *11 (N.D. Ga. Mar. 21, 2019) ("Through his typewritten signature, Mr. Khan has evinced his intention to submit sworn declarations, which the Court will accept as such and treat as affidavits for purposes of ruling on summary judgment."). The case that Plaintiff cites, Sharpe, while relevant, is less on-point than Middlebrooks or CFPB. See Sharpe v. Global Sec. Int'l, 766 F. Supp. 2d 1272, 1279–80 (S.D. Ala. 2011) (rejecting an argument that because the body of declarations were typewritten, they should be stricken). In sum, the Court will not strike or otherwise exclude the Bremerman or McCusker Rees declarations on account of electronic signatures.

That leaves the Burke declaration. Plaintiff argues that the Burke declaration "is not made upon personal knowledge and should not be accepted in support of Defendant's Motion for Summary Judgment." Doc. 105 at 4. Plaintiff adds that the Burke declaration "fails to meet the minimal standard required by the federal rules and the case law interpreting it." Id. (citing Pace v. Capobianco, 283 F.3d 1275, 1278 (11th Cir. 2002)). Defendant responds by arguing that "there is nothing problematic about a declaration making an assertion in terms of a declarant's belief." Doc. 108 at 6.

The Court will not strike or otherwise exclude the Burke declaration on the basis Plaintiff urges. Plaintiff claims that Pace precludes statements in affidavits

3

that are based "upon information and belief." Doc. 105 at 4; Pace, 283 F.3d at 1278–79. But what Pace really says is that affidavits based "upon information and belief" are precluded from "raising genuine issues of fact sufficient to defeat summary judgment." Pace, 283 F.3d at 1278. This is an important distinction. While Burke's declaration may not be able to create a material issue of fact as to whether Lester in fact retaliated against him, because applicable case law and the declaration's use of phrases like "I firmly believe that Mr. Lester retaliated against me," the declaration can establish in the record that Burke *believed* Lester had retaliated against him—a relevant fact for purposes of evaluating UPS's investigation of Lester.

To the extent Plaintiff's motion seeks to limit the scope of Burke's declaration, the Court somewhat agrees; Burke's declaration cannot definitively prove that Lester in fact retaliated against him. But the Court will not strike or otherwise exclude Burke's declaration on this basis either, since it is relevant to explain why UPS did what it did.[1] In light of the above, Plaintiff's Motion to Strike [105] is **DENIED**.

---

[1] Plaintiff's arguments in reply on this point are in essence a mere re-hashing of issues he has with the UPS investigation and Burke's language in his declaration. See Doc. 112 at 4–5. How much time elapsed between the events giving rise to this action and Burke's declaration is not a relevant fact for the Court to consider in determining whether to exclude or include the declaration from evidence at this stage. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) ("Credibility determination, the weighing of evidence, and the drawing of legitimate inferences

## II.    Defendant's Notice of Objection [111]

On July 29, 2025, Defendant filed a Notice of Objection to evidence submitted in Plaintiff's response to Defendant's Motion for Summary Judgment. See Doc. 111. In particular, Defendant argues that the Court should not consider three categories of materials: (1) the declaration of Jason Gauthier, see Doc. 99-2; (2) one paragraph of Plaintiff's declaration, see Doc. 99-13; and (3) Plaintiff's new theories asserted at summary judgment. See Doc. 111 at 1–7. The Court addresses each category in turn.

### a.  The Gauthier Declaration [99-2]

Defendant first objects to the Gauthier declaration as undisclosed evidence. See id. at 1. Defendant contends that Plaintiff never disclosed before or during discovery that Gauthier would claim that notes from his interview with two other UPS employees did not accurately reflect what he communicated. See Doc. 99-2 ¶¶ 11–18 (outlining how an interview summary written by an interviewing employee, Jeff Cantrell, "contains several false statements" which Gauthier "did not make"). UPS claims in particular that Plaintiff failed to disclose that Gauthier would make such claims both in the initial disclosures and in responses to interrogatories. See Doc. 111 at 1–3. Plaintiff responds by contending that he did

---

from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.").

identify Gauthier "as a person with relevant knowledge" in his responses to interrogatories. See Doc. 113 at 1. Plaintiff also claims that "UPS asserts that it is prejudiced because it did not have an opportunity to depose Jason Gauthier." Id. at 4.

A party must, without awaiting a discovery request, provide to the other parties the name of each individual likely to have discoverable information—along with the subjects of that information. Fed. R. Civ. P. 26(a)(1)(A)(i). The disclosing party must also supplement or correct its disclosure or response "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect." Fed. R. Civ. P. 26(e)(1)(A). Failure to comply with this rule will prevent the offending party from using that information to supply evidence on a motion. Fed. R. Civ. P. 37(c)(1). The burden is on the offending party to establish that the failure to timely disclosure was substantially justified or harmless. Baldeo v. Dolgencorp, LLC, No. 8:12-cv-02762-EAK, 2014 WL 4749049, at *3 (M.D. Fla. Sep. 23, 2014).

The Court agrees with Defendant and will exclude the Gauthier declaration to the extent it suggests that Cantrell created falsified notes. The issues with Gauthier's declaration fall into two categories: (1) Plaintiff did not adequately disclose that Gauthier would make the allegation regarding Cantrell's notes; and (2) Plaintiff made additional disclosures in an untimely fashion.

The Court deals first with the substance of Plaintiff's disclosures. Take Plaintiff's response to Defendant's first set of interrogatories on January 5, 2024 as an example. See Doc. 78-35. Gauthier is mentioned seven times in Plaintiff's response, but none of those instances disclose or even hint at what Gauthier now alleges in his declaration—that Cantrell's interview notes were false. See id. at 4, 13. Interrogatory One asked Plaintiff to identify persons with knowledge regarding Plaintiff's allegations and, as to each person, provide what the person's knowledge was or what relevant information they had. See id. at 3. Plaintiff stated that Gauthier, among the other individuals listed, had "knowledge that Mr. Lester was terminated unlawfully and that the reasons given by UPS for terminating his employment were vague and meritless." Id. at 4. In the section of the interrogatories dealing with admissions or declarations against interest,[2] Plaintiff describes the events and communications leading to Gauthier's 2020 demotion. See id. at 13. None of these instances even slightly suggest that Gauthier believes Cantrell's investigation notes were falsified.

The second disclosure occurred on August 2, 2024—about two weeks before the close of discovery on August 19. There, Plaintiff discloses Gauthier as having

---

[2] That interrogatory asked, "Identify every oral or written statement made by UPS or any of UPS's current or former directors, officers, managers, supervisors, employees or agents, that you contend constitutes an admission or declaration against interest, or on which you intend to rely as evidence or support for any of your claims in the Complaint." Doc. 78-35 at 6.

three categories of discoverable information: (1) the voluntary work and travel of Burke, among other employees; (2) that Lester never stated, ordered, or intended Burke's rotation as punishment or as retaliation for Burke having made a complaint against Gauthier; and (3) the discriminatory and unfair treatment of Lester by Bremerman. Doc. 111-1 at 9. It is conceivable from these disclosures that Gauthier's declaration statement that Bremerman is a racist was properly disclosed to Defendant. See id. (noting the discriminatory and unfair treatment of Lester by Bremerman). However, the Court does not understand any of these three categories to reach so far as to be a proper disclosure that Gauthier believed the investigation into Lester was a sham, or more specifically, that Cantrell falsified investigation notes from an interview between Gauthier and Cantrell. That Gauthier had these beliefs is not apparent from his disclosures either to the interrogatories or in his amended initial disclosures.

The substance lacking from these disclosures is only made worse by the timing. As noted, the interrogatory responses were served in January of 2024—well before the close of discovery. See Doc. 78-35 at 19. These responses were rather specific and had the ability to clearly disclose what Gauthier now alleges. But there is no evidence to suggest that Plaintiff ever amended those interrogatory responses to reflect these new allegations. Moreover, the amended initial disclosures—to the extent they do shed some additional light as to what Gauthier

8

now alleges in his declaration—were served a mere two weeks before the close of discovery. See Doc. 111-1. Allowing Plaintiff to file and rely on the new revelation in the Gauthier declaration—signed just four days before Plaintiff filed his summary judgment response and after discovery had long expired—"is exactly what the modern day discovery rules were designed to eliminate." Dugas v. 3M Co., No. 3:14-cv-1096-J-39JBT, 2015 WL 3938777, at *3 (M.D. Fla. June 26, 2015) (noting with disapproval the concept of "litigation by ambush").

Plaintiff contends that because he disclosed Gauthier in the responses to interrogatories "among a list of individuals with knowledge of the allegations in the Complaint and stated that these individuals had knowledge that Plaintiff was terminated unlawfully," that Gauthier in fact had been properly disclosed as it relates to his declaration. See Doc. 113 at 1. This misses the mark. Plaintiff did not say that Gauthier knew what he now asserts in his declaration—that Cantrell's interview summary contained false statements. See Doc. 99-2 ¶ 15.[3] Because the Court agrees with Defendant that Plaintiff never disclosed the information Gauthier now asserts in his declaration with respect to Cantrell, see Doc. 99-2, and

---

[3] This applies to Plaintiff's Amended Initial Disclosures as well. See Doc. 111-1. In his Amended Initial Disclosures, Plaintiff identified Gauthier as having knowledge: (1) of the voluntary work and travel of Burke and all other UPS employees, during the period in question; (2) that Lester never stated, ordered or intended Burke's rotation to be punishment or to serve as retaliation for Burke having played a role in Gauthier's demotion; and (3) of the discriminatory and unfair treatment of Lester by Bremerman. See id. at 9.

because Plaintiff also failed to timely disclose such information, that declaration must be excluded. See, e.g., Pete's Towing Co. v. City of Tampa, 378 F. App'x 917, 920 (11th Cir. 2010) (affirming district court's exclusion of certain allegations in an affidavit on the grounds that those allegations "had not been included in prior responses to discovery requests.").

Plaintiff's argument that "UPS asserts it is prejudiced because it did not have an opportunity to depose Jason Gauthier" simply misunderstands Defendant's argument. Doc. 113 at 4. UPS argues that it "would be prejudiced if the Court considered" Gauthier's testimony. Doc. 111 at 4. In other words, UPS does not argue it was prejudiced by its own choice not to depose Gauthier but rather that had it known Gauthier planned to state what is contained in his affidavit, it *would have* deposed him on that point. And the Court agrees that an inability to depose Gauthier now on that topic constitutes prejudice.

Finally, to the extent Plaintiff argues that the allegation regarding Cantrell's investigation notes was uncovered only after extensive discovery and thus was unavailable to Plaintiff at the time of the initial disclosures or responses to interrogatories, the Court rejects this position. See Doc. 113 at 2–4. Plaintiff contends that "[o]nly through discovery" could he learn that "UPS attributed false statements to Jason Gauthier in the investigative file." Id. at 2. This is not exactly what occurred here. As far as the Court can tell, the specific allegation that Cantrell

attributed false statements to Gauthier appears only in Gauthier's declaration made

on July 3, 2025. See Doc. 99-2 at 6.[4] That date was in fact *after* the close of

discovery, even when considering the limited purpose for which the Court

reopened discovery in April of 2025. See Doc. 72 at 11–12 (reopening discovery

for fourteen days on April 23, 2025 for a limited purpose). Thus, the idea that

Gauthier's declaration allegations were uncovered during the course of discovery

finds no support in the record.

In sum, the Court will exclude the Gauthier declaration [99-2] to the extent it

asserts that Cantrell's investigation notes were falsified.

### b. **Paragraph 18 of the Lester Declaration**

Defendant also objects to paragraph 18 in Lester's declaration. See Doc. 111

at 4. Defendant contends that the Court "should not consider these conclusory

assertions in Lester's declaration because these statements are likewise conclusory

and lack foundation." Id. at 5. Plaintiff appears to re-apply an argument he uses in

connection with the Gauthier declaration—that discovery revealed the fraudulent

nature of UPS's investigation. See Doc. 113 at 2–3.

---

[4] Indeed, Gauthier states in his declaration that he had not seen the Cantrell interview summary prior to the day Gauthier made his declaration—July 3, 2025. See Doc. 99-2 ¶ 14. The fact that Gauthier had only seen the summary as of July 3—and not earlier—lends further support for the Court's conclusion. Plaintiff could not have possibly disclosed something that Gauthier did not even know himself.

The Court agrees with Defendant that paragraph 18 in Lester's declaration should be excluded. That particular statement is conclusory, lacks foundation, and provides little to no specifics. See Doc. 99-13 ¶ 18 ("The 'Conversation with Waring Lester' document appears to give an account of the conversation I had with Danelle McCusker and Ulysses Grant, but it contains several material misrepresentations of my statements during that conversation."). As Defendant rightly points out, this statement completely fails to identify what portions of the documents contain material misrepresentations or how what Lester said was different from those alleged misrepresentations. Because of its conclusory nature, the Court will not consider paragraph 18 of Lester's declaration. See, e.g., Jones v. Spherion Atl. Enter., LLC, 493 F. App'x 6, 9 (11th Cir. 2012) (noting that conclusory testimony "does not create a question of material fact precluding summary judgment"); see also Lockett v. City of Atlanta, 1:21-CV-4406-ELR-JKL, 2023 WL 10475982, at *21 (N.D. Ga. Dec. 22, 2023) (Ross, J.) (noting that declaration testimony "should be disregarded as conclusory and lacking foundation when it" provides no specific facts to identify the actual conduct at issue).

In sum, the Court will exclude paragraph 18 of Lester's declaration [99-13].

### c. **Plaintiff's "New Theories"**

Defendant's last argument in its notice of objection is that the Court should not consider the "new theories" Plaintiff advances in his brief in response [98] to

12

Defendant's motion for summary judgment. See Doc. 111 at 5–7. UPS argues in particular that while Plaintiff alleged in his Complaint and during his deposition that Bremerman was essentially the sole individual who discriminated and retaliated against Plaintiff, this is not what Lester now advances at summary judgment. See id. at 5–6. Instead, Defendant contends that Plaintiff "completely changed his theory" in response to summary judgment. Id. at 6 (citing the Complaint and Lester's deposition testimony). Now, according to Defendant, Plaintiff claims "that a far larger ensemble of employees discriminated or retaliated against him." Id. In response, Plaintiff contends that the core theory of the case "remains unchanged," while additional facts and actors have been uncovered through discovery. See Doc. 113 at 5 (citing Fed. R. Civ. P. 56).

The Court agrees with Defendant here as well. For one, Plaintiff's Complaint makes mention only of Bremerman with respect to alleged discrimination. See generally Doc. 1. There is no allegation in Plaintiff's Complaint regarding what Plaintiff now contends happened in his response brief— a coordinated effort by McCusker Rees, Grant, Cantrell, and Bremerman to discriminate and retaliate against Plaintiff. See Doc. 98 at 2 (contending that "UPS's unlawful discrimination and retaliation scheme in this instance was a coordinated effort across multiple UPS departments including Operations, Human Resources, and Compliance."). The fact that Defendant lacked any notice

13

regarding this new allegation of a coordinated scheme is also supported by Plaintiff's own testimony during deposition. See Doc. 78-10 at 113:20–114:5 ("Q: Okay. In addition to Mr. Bremerman, who else [do] you claim treated you unfairly and that it resulted in your termination? A: That's my stance. Q: When I ask you who else, to tell me 'That's my stance' is not – A: No one . . . That's Mr. Bremerman. Q: No one. Just Mr. Bremerman? A: Yes.").

"Simply put, raising a new legal claim or theory for the first time at the summary judgment stage is improper." Li v. Walsh, No. 16-81871-CIV, 2022 WL 892703, at *4 (S.D. Fla. Feb 18, 2022); see also Dukes v. Deaton, 852 F.3d 1035, 1046 (11th Cir. 2017) (same). Plaintiff here has asserted new theories—a conspiracy between multiple employees to cause Lester's termination, fabrication of interview notes, and a bad-faith "anonymous" concern—that are nowhere to be found at prior points in the litigation. If Plaintiff had wanted to add to his Complaint these new theories, the proper procedure would have been to amend the complaint. The Court will exclude the "new theories" Plaintiff asserts in his response brief.

In sum, Defendant's Notice of Objection [111], which is essentially a motion to exclude, is **GRANTED** to the extent explained above.

14

### III.   <u>Summary Judgment Standard</u>

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support that assertion by[] . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). The moving party has an initial burden of informing the court of the basis for the motion and showing that there is no genuine issue of material fact. <u>Celotex Corp v. Catrett</u>, 477 U.S. 317, 323 (1986); <u>see also</u> <u>Arnold v. Litton Loan Servicing, LP</u>, No. 1:08-cv-2623-WSD, 2009 WL 5200292, at *4 (N.D. Ga. Dec. 23, 2009) ("The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact." (citing <u>Herzog v. Castle Rock Ent.</u>, 193 F.3d 1241, 1246 (11th Cir. 1999))). If the non-moving party will bear the burden of proving the material issue at trial, then in order to defeat summary judgment, that party must respond by going beyond the pleadings, and by the party's own affidavits, or by the discovery on file, identify facts sufficient to establish the existence of a genuine issue for trial. <u>See</u> <u>Celotex</u>, 477 U.S. at 322, 324. "No genuine issue of material fact exists if a party has failed

15

to 'make a showing sufficient to establish the existence of an element . . . on which that party will bear the burden of proof at trial.' " AFL-CIO v. City of Miami, 637 F.3d 1178, 1186–87 (11th Cir. 2011) (quoting Celotex, 477 U.S. at 322).

Furthermore, "[a] nonmoving party, opposing a motion for summary judgment supported by affidavits[,] cannot meet the burden of coming forth with relevant competent evidence by simply relying on legal conclusions or evidence which would be inadmissible at trial." Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991), cert. denied, 506 U.S. 952 (1992); see also Fed. R. Civ. P. 56(c)(1)(B), (c)(4). The evidence "cannot consist of conclusory allegations or legal conclusions." Avirgan, 932 F.2d at 1577. Unsupported self-serving statements by the party opposing summary judgment are insufficient to avoid summary judgment. See Midwestern Waffles, Inc. v. Waffle House, Inc., 734 F.2d 705, 714 (11th Cir. 1984). For a dispute about a material fact to be "genuine," the evidence must be such that "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249–50 (internal citations omitted). It is not the court's function at the summary judgment stage to determine credibility or decide the truth of the matter. Id. at 249, 255. Rather, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [the nonmovant's] favor." Id. at 255.

16

**IV.    Facts for Purposes of Summary Judgment**

**a.  Standards for Determining Summary Judgment Facts**

The facts, for summary judgment purposes only, are derived from Defendant's statement of undisputed material facts in support of its motion (Doc. 78 ("Def. SMF")); Plaintiff's response to Defendant's statement of facts (Doc. 100 ("Pl. resp. to Def. SMF")); Plaintiff's statement of additional material facts (Doc. 99 ("Pl. SAMF")); Defendant's response to Plaintiff's statement of additional facts (Doc. 110 ("Def. resp. to Pl. SAMF")); and uncontroverted record evidence.

The undersigned has reviewed the record, including the parties' summary judgment filings, to determine whether genuine issues of material fact exist to be tried. But "[i]t is not the Court's function to scour the record in search of evidence to defeat a motion for summary judgment. Instead, the Court relies on the nonmoving party to identify the evidence which creates an issue of triable fact." Cisero v. ADT LLC of Del., No. 1:19-cv-04319-SDG-CMS, 2021 WL 1712206, at *2 (N.D. Ga. Apr. 27, 2021), adopted by 2021 WL 4472977 (N.D. Ga. Sep. 30, 2021). In ruling on a summary judgment motion, the facts are construed in the light most favorable to the non-movant. See Frederick v. Sprint/United Mgmt. Co., 26 F.3d 1305, 1309 (11th Cir. 2001).

### b.  Facts

### Lester's Employment Background

Plaintiff Waring Lester spent 34 years as an employee of Defendant UPS. Def. SMF ¶ 12. At the time his employment was terminated in October 2021, Lester was a District Manager for the Desert Mountain District—a position he had held since July of 2019. Def. SMF ¶ 12; Pl. SAMF ¶ 1. About six months into Lester's tenure as District Manager, his direct manager was replaced by Scott Bremerman, a UPS West Region Manager and Vice President. Pl. SAMF ¶ 3.

Bremerman began his first meeting with Lester and his team by stating that the district had a leadership problem. Pl. SAMF ¶ 5. Other employees noted and complained about Bremerman's conduct, especially towards Lester. Pl. SAMF ¶¶ 6–10. During a discussion between Bremerman and Lester regarding Bremerman's treatment of UPS employees, Lester complained that nothing was ever done about Bremerman's mistreatment of people—including Black employees.[5] Pl. SAMF ¶¶ 9–12.

---

[5] In his Verified Complaint, Plaintiff alleges he specifically referenced the mistreatment of Black employees in this conversation. Doc. 1 ¶ 36. But the Court notes that, at his deposition, Lester later testified that he never referenced race during this interaction. See Doc. 78-10 at 247:21–248:3.

**The First Investigation and Gauthier Demotion**

In 2020, multiple UPS employees, including one named Jerwin Burke, made hotline complaints against an Operations manager named Jason Gauthier. Def. SMF ¶ 14.[6] A hotline complaint is a mechanism through which employees can report perceived misconduct. Def. SMF ¶ 3. Burke is a white male who has been the subject of various investigations relating to performance issues. Pl. SAMF ¶¶ 26–27.[7] UPS investigated Burke's complaint against Gauthier and determined that it was substantiated. Def. SMF ¶ 16. Gauthier was demoted as a result of the investigation. Def. SMF ¶ 18.

---

[6] Plaintiff's Response to Defendant's statement of facts omits this fact entirely. See Doc. 100 at 6 (skipping from fact 13 to fact 15). As a result, it is deemed admitted. See LR 56.1(B)(2)(a)(2), NDGa (noting that the Court will deem each fact admitted unless the respondent refutes the fact, states a valid objection to the fact, or points out that the movant's citation does not support the movant's fact).

[7] Defendant disputes Plaintiff's fact 27 on the grounds that the cited evidence fails to support fact 27. See Def. resp. to Pl. SAMF ¶ 27. The Court disagrees. While Defendant rightly points out that Lester testified that he viewed Burke as a knowledgeable and good performer, this does not refute that Burke's performance was at one time the subject of investigation. See, e.g., Doc. 99-9 at 2 (noting that "[t]here had been a couple of internal investigation and allegations against [Burke]"); see also Doc. 99-8 at 2 (noting that Burke "has lots of performance problems"). Because Defendant's dispute of fact 27 fails to refute that Burke's had been the subject of investigation, the Court deems this part of Plaintiff's fact 27 admitted.

**Burke's Complaint Against Lester and the Ensuing Investigation**

Soon after Burke made his hotline complaint against Gauthier, Burke went on stress leave for about three months. Def. SMF ¶ 20; Pl. SAMF ¶ 28. While Burke was on leave, his responsibilities were filled by another employee, Karl Walters. Pl. SAMF ¶ 28. When Burke returned from leave, he was rotated on a series of "special assignments" away from his assigned position in New Mexico. Def. SMF ¶ 22.[8] This included Burke assisting a "recovery team" to aid a Tucson, Arizona facility. Pl. SAMF ¶ 29. After several rotations, Burke made another complaint against Lester and claimed that Lester and Gauthier had retaliated against him. Def. SMF ¶ 24; Pl. SAMF ¶ 25.[9] UPS initiated an investigation into

---

[8] Plaintiff disputes this fact. See Pl. resp. to Def. SMF ¶ 22. But while Plaintiff's explanation of his dispute of fact 22 provides a possible explanation as to why Burke was placed on "special assignments," the Court does not understand Plaintiff's dispute as one actually rebutting the assertion that Burke was placed on "special assignments" in the first place. Defendant's fact 22 simply provides that Burke went on "special assignments." Def. SMF ¶ 22. It does not provide the reason why he went on special assignments. Plaintiff's dispute of fact 22 thus fails to directly refute what Defendant's fact 22 stands for, and fact 22 is deemed admitted as a result. See LR 56.1(B)(2)(a)(2), NDGa.

[9] Plaintiff contends that he disputes in part Defendant's fact 24. Pl. resp. to Def. SMF ¶ 24. But again, this dispute does not actually refute what Defendant's fact 24 stands for. That fact simply provides that Burke made another complaint against Lester after several rotations. Def. SMF ¶ 24. Plaintiff's dispute simply provides additional detail regarding when Burke made the complaints at issue and that he also complained about other employees at the same time. Pl. resp. to Def. SMF ¶ 24. Because Plaintiff's response does not refute Defendant's fact 24, it is deemed admitted. See LR 56.1(B)(2)(a)(2), NDGa.

Burke's complaint against Lester. Def. SMF ¶ 25; Pl. SAMF ¶ 25. The investigation was conducted by, among others, UPS employees Jeff Cantrell, Peter Menosky, and Eric Mauro. Pl. SAMF ¶¶ 52–53.[10] During the course of the investigation, UPS investigated nearly two dozen employees, including some higher-level personnel. Def. SMF ¶¶ 27–28. UPS's compliance team found during its investigation that Burke was rotated to four divisions away from his home division, ultimately resulting in his retirement. Def. SMF ¶ 29.[11]

Multiple UPS employees reported during the course of the investigation that Lester and Gauthier had a close relationship and that there was "an atmosphere of

---

[10] Plaintiff's fact 52 asserts that Cantrell "led" the investigation. Pl. SAMF ¶ 52. The excerpt from Cantrell's deposition that Plaintiff cites in support of this assertion, however, does not show that Cantrell "led" the investigation. See Pl. SAMF ¶ 52 (citing Cantrell Deposition at 11:14–12:10). The Court therefore finds here for purposes of the fact section that Cantrell simply participated in the investigation.

[11] Plaintiff claims he disputes this fact, but his response in reality confirms what Defendant's fact 29 says. See Pl. resp. to Def. SMF ¶ 29 (noting that Burke rotated to four locations upon his return from disability leave). And while he may dispute *why* Burke was moved around, it is clear that *UPS's investigation* concluded that Burke "was not allowed to return to his home division of New Mexico . . . until he announced his retirement." Doc. 78-21 at 4.

fear" in the district. Def. SMF ¶¶ 30–31; Doc. 78-17 at 5–6.[12] Some employees

even stated that Gauthier told people he reported to Lester. Def. SMF ¶ 32.[13]

When UPS began interviewing employees regarding Burke's complaint

against Lester, it discovered that some employees understood Lester to be rotating

Burke to various districts in an effort to force Burke to retire. Def. SMF ¶ 36.[14]

During UPS's interview with Gauthier, he admitted that he told several staff

---

[12] Plaintiff uses the same language to dispute Defendant's facts 30 and 31. See Pl. resp. to Def. SMF ¶¶ 30–31. But that response fails to actually refute either fact. Fact 30 asserts that UPS found during its investigation that Lester and Gauthier had a close relationship. Def. SMF ¶ 30. Fact 31 asserts that some employees said that there was an atmosphere of fear in the district. Def. SMF ¶ 31. Plaintiff's responses to these two facts simply provides what role Lester served in prior to his termination, as well as what Gauthier did following his demotion. See Pl. resp. to Def. SMF ¶¶ 30–31. This does not refute either fact. As a result, these facts are deemed admitted. See LR 56.1(B)(2)(a)(2), NDGa.

[13] See supra n.10.

[14] Plaintiff disputes Defendant's fact 36. See Pl. resp. to Def. SMF ¶ 36. Fact 36 states that during an interview, Elmessan stated that Lester had said it was his intention to rotate Burke to make Burke's life miserable until Burke quit. See Def. SMF ¶ 36; see also Doc. 78-18 at 2. Doc. 78-18 includes notes from an interview of Elmessan on May 19, 2021. See Doc. 78-18 at 2. The evidence Plaintiff cites to dispute fact 36—Doc. 99-18—is from a June 21, 2021 telephone conference with Elmessan. Thus, while Plaintiff is correct that Elmessan stated on June 21 that Burke asked to work in Colorado because Burke's family was in Colorado, Defendant is also correct that Burke stated in an interview that Lester wanted to rotate Burke until Burke quit. The two statements by Elmessan are not mutually exclusive such that an issue of fact exists here. In other words, Elmessan could have understood that Burke wanted to work in Colorado because his family was there while simultaneously being told that Lester was rotating Burke until he quit.

managers that Burke contacting the UPS hotline meant that Burke could not be trusted and that he told other employees that Burke and another person were the reason Gauthier was demoted. Def. SMF ¶ 38.[15] UPS employees found Gauthier to not be credible and, in their view, felt Gauthier "was protecting" Lester during the course of the interview. Def. SMF ¶ 40; Doc. 78-17 at 11.[16]

UPS also interviewed Lester, during which time he alternated between characterizing Burke as a poor performer and claiming that Burke was needed to help lower-performing UPS facilities. Def. SMF ¶ 43.[17] Ultimately, UPS found Lester's interview responses uncredible and at times contradictory. Def. SMF ¶¶ 47–48.[18] Neither Cantrell nor Mauro, employees involved in the investigation,

---

[15] Plaintiff's response to Defendant's fact 38 cites to Gauthier's declaration which the Court has since excluded in part. Because Plaintiff's response to fact 38 relies on the portion of the declaration excluded, the Court deems Defendant's fact 38 admitted. See LR 56.1(B)(2)(a)(2), NDGa.

[16] Plaintiff also disputes this fact but uses the Gauthier declaration as evidence. Pl. resp. to Def. SMF ¶ 40. Since the Court has excluded that declaration to the extent it applies here, the fact is deemed admitted. See LR 56.1(B)(2)(a)(2), NDGa.

[17] Plaintiff disputes this fact but relies on declaration testimony that has been excluded by the Court. See Pl. resp. to Def. SMF ¶ 43 (citing the Lester Declaration at ¶ 18). The fact is therefore admitted. See LR 56.1(B)(2)(a)(2), NDGa.

[18] Plaintiff disputes these facts but cites to evidence since excluded by the Court. See Pl. resp. to Def. SMF ¶¶ 47–48 (citing the Gauthier Declaration and the Lester Declaration at ¶ 18). These facts are thus admitted. See LR 56.1(B)(2)(a)(2), NDGa. Moreover, this fact simply states what *UPS found* in its investigation—not whether the finding was ultimately correct.

discussed any portion of the investigation with Bremerman. Def. SMF ¶ 49.[19] UPS

also received other hotline concerns from employees regarding Gauthier and Lester

during this time. Def. SMF ¶ 50. Based on its investigation, UPS concluded that

Lester and Gauthier retaliated against Burke. Def. SMF ¶ 51.[20] In particular, UPS

concluded that Lester actively retaliated against Burke for calling in a hotline

concern that resulted in Gauthier's demotion. Def. SMF ¶ 52.[21]

---

[19] Plaintiff fails to adequately dispute fact 49. He contends that Bremerman's refusal to answer Plaintiff when asked about what conduct and what policy he violated is evidence that Bremerman conspired in the sham investigation. Pl. resp. to Def. SMF ¶ 49 (citing United States v. Andreatta, 737 F. App'x 925, 931, 933–34 (11th Cir. 2018)). Andreatta involved a nine-count indictment, including charges for wire fraud and aggravated identity theft. See id. at 928. It is unclear to the Court how Andreatta has any bearing on whether Bremerman's refusal to answer Lester is circumstantial evidence, direct evidence, or some combination of the two in the Title VII context to refute that Bremerman did not participate in the investigation.

[20] Plaintiff disputes this fact but provides no explanation as to why he disputes it besides citing to Plaintiff's statement of additional material facts. See Pl. resp. to Def. SMF ¶ 51. The citation Plaintiff uses is to over twenty asserted facts, which contravenes this District's local rules regarding responses to statements of fact. See id.; LR 56.1(B)(2)(a)(2), NDGa (requiring specificity in citations). Fact 51 is deemed admitted as a result. Beyond that, the fact is couched in *what UPS concluded*, which is not otherwise disputed by any of those facts, even if the Court did consider them in full.

[21] See supra n.18.

**Lester's Termination**

Cantrell ultimately prepared a recommendation that Lester be terminated for substantiated hotline retaliation. Def. SMF ¶ 53. The Concerns Committee, to which Cantrell sent his recommendation, unanimously agreed that Lester should be terminated. Def. SMF 54.[22] The Concerns Committee is a committee that investigates complaints against high-level employees. Def. SMF ¶ 8. Danelle McCusker Rees, a Senior Vice President and Global Head of Talent for UPS, along with several other UPS employees, then notified UPS HR employee Jeff Grant and Bremerman that the Concerns Committee had determined that Lester should be terminated. Def. SMF ¶ 56; Doc. 78-41 ¶ 2.[23] Prior to being notified by McCusker Rees and others, Bremerman was unaware of the investigation into Lester. Def. SMF ¶ 57.[24] Bremerman declined to overturn the Concerns Committee's determination that Lester should be terminated. Def. SMF ¶ 58.[25]

---

[22] Plaintiff disputes in part Defendant's fact 54 but not the portion of fact 54 that the Court uses here. See Pl. resp. to Def. SMF ¶ 54.

[23] Plaintiff disputes this fact by contending that the Bremerman and McCusker Rees declarations are unsigned. See Pl. resp. to Def. SMF ¶ 56. In light of the preceding discussion on Plaintiff's Motion to Strike [105], fact 56 is deemed admitted.

[24] See supra n.17.

[25] In light of the Court's ruling supra regarding the declarations of Bremerman and McCusker Rees, the Court finds Plaintiff's dispute of fact 58 without merit.

On October 18, 2021, McCusker Rees and Bremerman met Lester at a Denver, Colorado Starbucks. Def. SMF ¶ 60.[26] During this meeting, McCusker Rees and Bremerman informed Lester that he was being terminated for violating UPS's anti-retaliation policy in connection with Burke. Def. SMF ¶ 60.

## Post-Termination Developments

Following his termination, Lester filed a charge of discrimination with the EEOC on April 4, 2022. Def. SMF ¶ 70; Doc. 78-36 at 15. Lester claimed in his charge that UPS fired him "through Mr. Bremerman." Def. SMF ¶ 70; Doc. 78-36 ¶ 51. He claimed further that UPS violated Title VII when it terminated his employment for the purpose of replacing him with a less qualified white employee. Def. SMF ¶ 71; Doc. 78-36 ¶ 64. Lester also claimed retaliation. Def. SMF ¶ 71; Doc. 78-36 ¶ 65. The EEOC ultimately found unsubstantiated Lester's discrimination and retaliation claims. Def. SMF ¶ 74; Doc. 78-38 at 2–3. The EEOC's findings made no reference to any other type of claim beyond discrimination and retaliation. Def. SMF ¶ 75.

---

[26] Plaintiff's "dispute" of fact 60 simply provides additional factual background but fails to actually refute what fact 60 stands for—that McCusker Rees and Bremerman met Lester in Denver to inform him that he was being terminated for violating UPS's anti-retaliation policy. See Pl. resp. to Def. SMF ¶ 60.

Lester identified two alleged complaints of discrimination or harassment. Def. SMF ¶ 62.[27] Lester has no proof that Bremerman initiated the investigation against him. Def. SMF ¶ 63.[28] Nor does Lester have proof that Bremerman caused the Concerns Committee to find that Lester and Gauthier engaged in hotline retaliation against Burke. Def. SMF ¶ 65.[29]

V.    **Defendant's Motion for Summary Judgment**

Defendant UPS argues that Lester has failed to establish a retaliation claim, that his discrimination claim fails as a matter of law, and that his breach of contract claim fails to plead the existence of a contract. See Doc. 77-1 at 11–26. The Court addresses each claim in turn.

---

[27] Plaintiff disputes this fact but only cites his Verified Complaint in full, without specifying which allegation the Court should consider. See Pl. resp. to Def. SMF ¶ 62. Per the local rules, a party responding to a statement of undisputed facts must refute the fact with concise responses supported by specific citations to evidence. See LR 56.1(B)(2)(a)(2), NDGa. Because Plaintiff fails to provide specific citations to refute Defendant's fact 62, it is deemed admitted.

[28] See supra note 17. Plaintiff again cites Andreatta here and argues that Bremerman's refusal to answer Lester when asked about what conduct and policy he violated is evidence that Bremerman conspired in the sham investigation. See Pl. resp. to Def. SMF ¶ 63. This response does not refute Defendant's fact 63 pursuant to the local rules and is deemed admitted as a result.

[29] See supra note 17.

### a. **Retaliation**

Defendant's first argument is that Plaintiff fails to establish a retaliation claim. See id. at 11. UPS rests on two primary arguments in support of this claim. First, UPS argues that Plaintiff did not engage in protected activity. See id. at 12–16. Second, UPS argues that there is no evidence that any protected activity caused Plaintiff's termination. Id. at 16–17. Plaintiff responds that his January 29, 2021 complaint was protected activity. See Doc. 98 at 8–10.[30]

To prevail on an employment discrimination or retaliation claim under Title VII, a plaintiff must show intentional discrimination or retaliation using circumstantial evidence, direct evidence, or both. Tynes v. Fla. Dep't of Juv. Just., 88 F.4th 939, 944 (11th Cir. 2023). To evaluate a claim supported by circumstantial evidence, Courts have applied either the McDonnell Douglas burden-shifting framework, or the convincing mosaic. See Ismael v. Roundtree, 161 F. 4th 752, 760–63 (11th Cir. 2025); Tynes, 88 F.4th at 944. Under the

---

[30] It is worth noting that while Defendant discusses the January 29 complaint as well as a comment made during an internal review, see Doc. 77-1 at 13–14, the Court cannot locate any argument made by Plaintiff that the comments made during the internal review were protected activity. See generally Doc. 98. "It is not the duty of the court to uncover and discuss every potential argument that can be made." Edwards v. Nat'l Vision, Inc., 946 F. Supp. 2d 1153, 1174 (N.D. Ala. 2013). Grounds alleged in a complaint but not relied upon in summary judgment are deemed abandoned. Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995). Because Plaintiff only responds in his brief with respect to the January 29 complaint, the Court focuses solely on this communication for purposes of the protected activity analysis.

McDonnell Douglas framework, the plaintiff first must establish a prima facie case, and if he does so, the plaintiff is entitled to a rebuttable presumption of intentional discrimination or retaliation; then, the burden shifts to the defendant/employer to rebut the presumption by providing a legitimate, non-discriminatory reason for the challenged employment action, and if defendant does so, the presumption is eliminated, and the court proceeds to analyze the claim under the convincing mosaic standard. See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); Ismael, 161 F.4th at 764–65.

The Eleventh Circuit has clarified that the McDonnell Douglas burden-shifting framework is an "evidentiary tool" only, designed to establish an order of proof and production, and "is *not* . . . an independent standard of liability," nor are any of its steps "the *sine qua non* for a plaintiff to survive a summary judgment motion." Tynes, 88 F. 4th at 944–946 (emphasis in original) (citations omitted); see also Ismael, 161 F.4th at 760. When a plaintiff cannot satisfy the McDonnell Douglas framework, "the inquiry does not end." Ismael, 161 F.4th at 765. The plaintiff may still present a "convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination [or retaliation] by the decisionmaker." Tynes, 88 F.4th at 946; see also Ismael, 161 F.4th at 760 (explaining that the convincing mosaic applies "in equal measure to claims of discrimination and retaliation").

To state a *prima facie* case for retaliation, a plaintiff must show: (1) that he engaged in a protected activity; (2) that he suffered a material adverse action; and (3) that there was a causal connection between the protected activity and the adverse action. Ismael, 161 F.4th at 759. Once the *prima facie* case is established, the employer then has an opportunity to articulate a legitimate, non-retaliatory reason for the challenged employment action. Pennington v. City of Huntsville, 261 F.3d 1262, 1266 (11th Cir. 2001). If the defendant is able to come forward with evidence of a legitimate, non-retaliatory reason, the McDonnell Douglas framework "simply drops out of the picture." Ismael, 161 F.4th at 764 (internal quotations omitted) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993)). At this point, the court must proceed to ask whether the record presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker. Ismael, 161 F.4th at 764. And if Plaintiff cannot establish a *prima facie* case, a court "should advance directly to the convincing mosaic inquiry." Id. at 765.

i. **McDonnell Douglas**

Defendant first argues that Plaintiff's January 29, 2021 complaint cannot be protected activity because Plaintiff "did not link the alleged conduct to any protected characteristic." Doc. 77-1 at 14. Defendant argues that this is fatal to his retaliation claim. See id. at 16. Plaintiff responds that his statements during the

30

January 29, 2021 call "clearly opposed Bremerman's conduct, which [Plaintiff] identified as mistreatment of Black UPS managers." Doc. 98 at 9.

Plaintiff alleges that he engaged in protected activity in his verified complaint. See Doc. 1 ¶ 36 ("During the phone call, Mr. Lester cautioned Mr. Bremerman and Jeff Grant that he could no longer explain to his team why nothing is ever done about Mr. Bremerman's mistreatment of people—particularly his mistreatment of Black UPS managers.");[31] see also, Canty v. Fry's Elecs., Inc., No. 1:09-cv-3508-WSD-LTW, 2012 WL 1038619, at *9 (N.D. Ga. Feb. 2, 2012) (noting that a "complaint about an employment practice, however, constitutes protected opposition only if the individual explicitly or implicitly communicates a reasonable belief that the practice constitutes unlawful employment discrimination against a class protected by Title VII or Section 1981." (citing Murphy v. City of Aventura, 383 F. App'x 915, 918 (11th Cir. 2010))).[32]

---

[31] But the Court notes that, at his deposition, Lester later testified that he never referenced race during this interaction. See Doc. 78-10 at 247:21–248:3.

[32] Defendant also argues that Plaintiff fails to establish causation. See Doc. 77-1 at 16–17. But Defendant appears to make this argument solely with respect to Plaintiff's statement during his 360 review—and not his January 29 statement to Bremerman. See id. Regardless, this is somewhat of a moot point. If Plaintiff failed on his *prima facie* case, the claim would go to the convincing mosaic regardless. See Ismael at 764–65. And because Defendant has offered a legitimate, nondiscriminatory reason for the adverse action, the claim will go to convincing mosaic even if Plaintiff succeeds in stating a *prima facie* case. See id.

31

Defendant, however, also provides a legitimate, nondiscriminatory reason for the adverse action: it concluded after an internal investigation that Lester had retaliated against Burke. See Doc. 77-1 at 19; see also Ismael, 161 F.4th at 764 (noting that after a plaintiff establishes a *prima facie* case, and defendant "comes forth with evidence and successfully rebuts the presumption," the McDonnell Douglas framework "simply drops out of the picture.").

## ii.    Convincing Mosaic

Plaintiff mentions in his response brief the convincing mosaic theory. See Doc. 98 at 15.[33] Even when a plaintiff cannot establish a *prima facie* case, he does not automatically lose on summary judgment. Ismael, 161 F.4th at 764. "Rather than lose by default, the consequence [of failing to establish the *prima facie* elements] is that the plaintiff must produce enough evidence, on her own and

_____

[33] Whether or not Plaintiff has specifically asserted the convincing mosaic theory here, the Court must nonetheless analyze Plaintiff's claim under this standard, too. As noted earlier, when a plaintiff cannot satisfy the McDonnell Douglas framework, "the inquiry does not end." Ismael, 161 F.4th at 765. The plaintiff may still present a "convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination [or retaliation] by the decisionmaker." Tynes, 88 F.4th at 946; see also Ismael, 161 F.4th at 760 (explaining that the convincing mosaic standard applies "in equal measure to claims of discrimination and retaliation"). The Court has done its best to sort through the arguments as they relate to each claim asserted by Plaintiff. Plaintiff mentions the convincing mosaic on one page of his response brief, and it is unclear to the Court whether he intends that argument to pertain to discrimination, retaliation, or both. See Doc. 98 at 15. Out of an abundance of caution, as well as in light of the Ismael decision, the Court has considered such arguments in the context of both claims.

32

without any helpful evidentiary burdens or presumptions, to demonstrate a material issue of triable fact." Id. at 765. A plaintiff can establish a convincing mosaic by presenting evidence that demonstrates suspicious timing, ambiguous statements, systematically better treatment of similarly situated employees, and that an employer's justification is pretextual. See, e.g., Lewis v. City of Union City, 934 F.3d 1169, 1185 (11th Cir. 2019); see also Berry v. Crestwood Healthcare LP, 84 F.4th 1300, 1311 (11th Cir. 2023) (noting that these categories of evidence are nonexclusive). Ultimately though, a court must ask at summary judgment simply "whether there is [a] sufficient evidentiary basis for the jury to find that the defendant intentionally discriminated [or retaliated] against the plaintiff." Ismael, 161 F.4th at 762 (quoting Tynes, 88 F.4th at 947); see also Ismael, 161 F.4th at 763 ("summary judgment should not be granted for failure to demonstrate pretext unless it also 'reflects a failure to put forward enough evidence for a jury to find for the plaintiff on the ultimate question of discrimination' or retaliation" (quoting Tynes, 88 F.4th at 947)).

The Court turns first to suspicious timing. Lewis, 934 F.3d at 1185. Plaintiff contends that the timing of the investigation and his ultimate termination less than nine months after he confronted Bremerman "is highly probative of retaliatory intent and suggests a causal connection between Mr. Lester's protected complaints and his termination." Doc. 98 at 16. While Plaintiff does allege protected activity

33

in his verified complaint[34]—that Lester could no longer justify to his employees Bremerman's mistreatment of black managers, see Doc. 1 ¶ 36, the timing is still not close enough to raise an issue. The time gap between the alleged protected expression and the adverse action—approximately nine months—is simply too long. See, e.g., Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007) (noting that three month period, "without more, does not rise to the level of 'very close' "). In addition, with respect to Bremerman, Plaintiff has not offered evidence suggesting that Bremerman was in fact the decisionmaker, an important part of the convincing mosaic test. See Ismael, 161 F.4th at 760 (noting that the plaintiff must present a convincing mosaic that would allow a jury to infer intentional discrimination by the decisionmaker).

Next, similarly situated employees. Lewis, 934 F.3d at 1185. Whether or not Harvey Hill was interviewed in connection with Burke's allegations against Lester has no bearing on the identification of a similarly situated white employee who was treated more favorably than Plaintiff. Plaintiff appears to suggest that UPS's stated reason for failing to interview Hill—that Hill was retired—is pretextual

---

[34] While it is true that Plaintiff alleges protected activity in his verified complaint, see Doc. 1 ¶ 36, this allegation is also contradicted by Plaintiff's own deposition testimony. See Doc. 78-10 at 247:21–248:3 (Lester stating that he did not recall bring up race during the January 29 call). Because Defendant proffers a legitimate, nondiscriminatory reason for the adverse action, however, the analysis proceeds to convincing mosaic anyways. See Ismael, 161 F.4th at 764–65.

because UPS interviewed Robertson, who was also retired. See id. at 23. But for purposes of the similarly situated employee analysis under the convincing mosaic standard, Lester needed[35] to identify a white employee who was also accused of complaint-related retaliation, and who was treated better than Lester. Plaintiff does not point to any evidence that white employees were accused of allegations similar to those made against Lester, much less that any such employees were treated more favorably than Lester. Finally, any comparison of Robertson to Hill is immaterial—what is relevant here is whether there is an employee similarly situated to *Lester* who was treated more favorably.

Third is pretext. Lewis, 934 F.3d at 1185. Plaintiff contends at various points during his response brief that the investigation into Lester that resulted in his termination was a "sham."[36] See, e.g., Doc. 98 at 15. And indeed, an employer's deviation from its own standard procedures can serve as evidence of pretext. See

---

[35] The Court is careful to note, however, that the factors from Lewis—including the similarly situated employee analysis—are not collectively or alone *necessary* in order for a convincing mosaic of discrimination or retaliation to exist. Ultimately, as the Ismael court stated, a plaintiff under the convincing mosaic approach must simply "put forward enough evidence for a jury to find for the plaintiff on the ultimate question of discrimination or retaliation." Ismael, 161 F.4th at 763 (internal quotations omitted). Notwithstanding this instruction, the Court finds the Lewis factors helpful.

[36] The undersigned has excluded the "sham investigation" as a late-disclosed theory change, but in case the district judge disagrees with that analysis, the undersigned has addressed it here out of an abundance of caution.

Hurlbert, 439 F.3d at 1299. But Plaintiff's arguments and citations to evidence fail to show any such deviation. Rather, Plaintiff takes issue with whether Burke was truly "forced" to rotate locations, see Doc. 98 at 16–17, how UPS failed to interview "critical" witnesses, see id. at 19–20, how Lester did not have notice and an opportunity to respond, see id. at 20–21, and how there was a pattern of discrimination against Black employees. Id. at 21. None of these arguments, however, reference UPS's standard procedure in these types of situations.

There are two instances in which Plaintiff attempts to reference standard UPS procedure. First is in connection with Grant and McCusker Rees' use of an anonymous complaint. See id. Plaintiff cites in this portion of his argument to UPS's Code of Business Conduct as authority for the idea that reports of unethical conduct should not be made anonymously. See id. This is hardly what the Code of Business Conduct says. See generally Doc. 78-4. In short, the Code does not prohibit anonymous reports and in fact stresses confidentiality. See, e.g., id. at 7 ("[t]he UPSHelp Line website is managed by a third party that is required by contract and/or by applicable laws to provide confidentiality.").

Plaintiff's second reference is in connection with a comment made during a deposition by Kiiyatana Johnson, an employee in UPS's HR department. Plaintiff contends that Johnson said it was "UPS policy to inform employees of the specific conduct that violated company policy when discipline is imposed." Doc. 98 at 13.

This is a misunderstanding of what Johnson said. In her deposition, Johnson said that, in her opinion, it would be "very odd" for an employee being terminated to not know the reason for their termination. See Doc. 102-1 at 63:13–17 ("so from an opinion standpoint and knowing how investigations work and—and being part of them, it would be very odd that an employee that's being [interviewed] would not know why they're—would not know the reason [for the interview or investigation]."). Johnson did not make any comment as to UPS's policies in connection with notice or an opportunity to respond. Moreover, Lester was interviewed in connection with the allegations against him. See Doc. 78-21 at 5 (outlining Lester's statements in an interview); see also Doc. 99-24 at 4 (noting that Lester was interviewed). The idea that Plaintiff had no notice or an opportunity to respond is contradicted by the fact that UPS actually interviewed him.

Plaintiff finally points to several other arguments as support for a convincing mosaic: that UPS informed white managers named in Burke's complaint without informing Plaintiff, that Bremerman was hostile towards Plaintiff, that Burke's allegations were factually impossible, and that there was a pattern of discrimination. Doc. 98 at 12–22.

First, as the Court discusses at other points of this report and recommendation, it appears that Burke's complaint in 2021 was lodged ultimately

against Lester—and not the white managers he named in his complaint letter. Even taking the facts most favorable to Lester, those managers appear to have been mentioned simply in Burke's effort to provide context to Carol Tomé. See generally Doc. 78-22. UPS understood Burke's complaint the same way. See Doc. 99-17 at 113 ("Just speaking to these two interviews here with Bloedorn and Robertson, the circumstances were we felt that they didn't have a direct involvement in the activities that had been alleged."). Thus, while UPS informed white managers named in Burke's complaint without informing Lester, this was because Lester was actually the focal point of the complaint. See Doc. 78-22 at 5 ("Researching this incident to see if activities like this have happened in [t]he past, I found numerous lawsuits with [W]arring and the same scenario."). The idea that the white managers were similarly situated to Lester but were informed of the allegations against them—while Lester was not—finds no support in the record.

Finally, to the extent the allegations were actually against the white employees as well, it appears UPS would not have told those white employees specifically about the allegations against *them*. See Doc. 99-17 at 114:15–115:5 ("Q: So because they were a named individual, you probably let them know what has been outlined in the allegations? A: It depends. We don't divulge like witness names or things like that or if other people are named in it, we only give them relevant information that they need to know. Q: At least notice of what alleged

38

conduct has occurred so that they can respond to what their knowledge is concerning the conduct? A: Not exactly. We describe to them the incidents that happened then we try to ask our questions in a way that have them tell us what they believe happened. We try to take steps to avoid say bating of witnesses I guess in saying what we want or things like that.").

Next, the fact that Bremerman might have been hostile towards Lester has no ultimate bearing on the convincing mosaic analysis here because, as mentioned, Plaintiff has not provided evidence that Bremerman actually was a decisionmaker.[37] Plaintiff also argues that Burke's allegations are "impossible"; namely, that Burke was being "forced" to go out on rotation. Doc. 98 at 16. In support of this, Plaintiff provides that Burke was on the UPS Ready Team, that Burke admitted that he had declined an offer to return to New Mexico or transfer to Colorado, and that there is no evidence of a 2020 complaint by Burke. Id. at 16–17. First, it is true that Burke was on the UPS Ready Team, which was a voluntary crisis response group sometimes involving rotational assignments. Pl. SAMF ¶¶

---

[37] Plaintiff attempts to create an issue regarding Bremerman's involvement in the investigation leading to Plaintiff's termination, but these efforts fall short. For example, Plaintiff argues that Bremerman's refusal to answer Lester when asked about what conduct and what policy he violated is evidence that Bremerman conspired in the sham investigation. Pl. resp. to Def. SMF ¶ 49. For one, the Court has excluded already Plaintiff's "conspiracy" theory. Moreover, even if it had not, Bremerman simply declining to tell Lester what policy he violated is hardly probative of Bremerman's involvement in a conspiracy to undertake a sham investigation, especially given that he was not involved in the investigation at all.

30–32. But the idea that Burke "admitted" that he had declined an offer to return to New Mexico omits important context—namely, that Burke declined to return to New Mexico because he would have essentially been accepting a demotion with lower stock awards (and a nominally lower salary). See Pl. SAMF ¶ 82. And with respect to Plaintiff's argument that there is no evidence of a 2020 complaint by Burke against Gauthier, the record appears to directly contradict this. See generally Doc. 78-15.

Plaintiff next points to the failure to interview Harvey Hill. Doc. 98 at 19–20. While the Court does find this fact odd or perhaps even slightly suspicious, especially in light of Hill's name appearing no less than 15 times in Burke's complaints, this alone would not be enough for a reasonable jury to infer intentional retaliation or discrimination. Simply failing to interview one person, even when that person is perhaps a crucial participant in the story being reported, is just not enough alone for a reasonable jury to infer intentional retaliation or discrimination. See Powe v. Farmers Ins. Exch., 667 F. Supp. 3d 1227, 1245 (N.D. Ga. 2023) ("Plaintiff's disagreement with the findings of the Summy's Fraud Investigation, and the methods Summy used to reach them, is insufficient to demonstrate pretext.").[38]

---

[38] The Court notes that, again, while pretext and convincing mosaic have different scopes of analysis, pretext is still relevant in evaluating whether a convincing mosaic exists. Ismael 161 F.4th at 764.

Plaintiff finally argues that there has been a pattern of discrimination. Doc. 98 at 21–22. Plaintiff points to other litigation he contends displays awards against UPS for discrimination, as well as news articles. Id. Without delving too deeply into the particular facts or procedural history of the Gratton case or any of the other cases Plaintiff cites, the Court does not find that these other cases would allow a reasonable jury to infer intentional retaliation or discrimination. This is primarily because there is no evidence that the same decisionmakers at issue here—the Concerns Committee—were implicated in any of those other cases. Thus, it is unclear how those other cases could shed light on whether the Concerns Committee acted with an intent to discriminate. The simple fact that the UPS corporate entity was involved here and there is not enough. And the same logic applies to the news articles Plaintiff cites. See Doc. 98 at 21–22.

Because Plaintiff has failed to establish proof of intentional retaliation, it is **RECOMMENDED** that Defendant's Motion for Summary Judgment with respect to Plaintiff's retaliation claim be **GRANTED**.

### b. <u>Discrimination</u>

Defendant's next argument is that Plaintiff's discrimination claim fails as a matter of law. See Doc. 77-1 at 18. In particular, Defendant argues that Plaintiff has failed to identify "similarly situated comparators who were allegedly treated more favorably." Id. Plaintiff argues in response that similarly situated white

41

employees were treated more favorably "throughout the investigation process." Doc. 98 at 22 (giving examples).

Title VII precludes employers from discriminating against an employee "because of" his race. 42 U.S.C. § 2000e-2(a). To demonstrate a *prima facie* case of discrimination under McDonnell Douglas, a plaintiff must show that: (1) he is in a protected group; (2) he was well qualified; (3) he suffered an adverse employment action; and (4) he was treated less favorably than similarly situated employees outside of his protected group. Ismael, 161 F.4th at 759. With respect to an adverse employment action, a plaintiff "need show only some injury respecting [his] employment terms or conditions. The transfer must have left [him] worse off, but need not have left [him] significantly so." Muldrow v. City of St. Louis, 601 U.S. 346, 359 (2024).

When a plaintiff cannot satisfy the McDonnell Douglas framework, "the inquiry does not end." Ismael, 161 F.4th at 765. The plaintiff may still present a "convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination . . . by the decisionmaker." Tynes, 88 F.4th at 946; see also Ismael, 161 F.4th at 760 (explaining that the convincing mosaic applies "in equal measure to claims of discrimination and retaliation").

42

### i.   <u>McDonnell Douglas</u>

For the reasons discussed in the section above on retaliation, Plaintiff fails to identify a similarly situated employee outside his classification. A plaintiff attempting to establish a *prima facie* case of intentional discrimination under Title VII must show that he was "treated differently from other individuals with whom []he was similarly situated in all material respects." <u>Lewis</u>, 918 F.3d at 1231. Without again explaining this issue in full, it suffices to say that an assertion devoid of citation in a response brief that, in a conclusory fashion, asserts that several white managers were treated better than Lester, is insufficient. <u>See</u> Doc. 98 at 22–23. Moreover, the record evidence appears to show that while Burke indeed mentioned various other white employees in his complaint, Burke was not lodging a complaint against those employees. <u>See</u> Doc. 78-22 at 5 ("Researching this incident to see if activities like this have happened in [t]he past, I found numerous lawsuits with [Plaintiff] and the same scenario."). In other words, the white employees mentioned in the complaint were not the ones actually being complained *about*—and thus were not similarly situated to Plaintiff. UPS likewise appears to have understood Lester as being the focal point of Burke's complaint. <u>See</u> Doc. 78-21 at 3 (outlining that Burke complained of "[r]etaliation by the District Manager," which was Lester); <u>see also</u> Doc. 99-17 at 113 ("Just speaking to these two interviews here with Bloedorn and Robertson, the circumstances were

we felt that they didn't have a direct involvement in the activities that had been alleged [by Burke]"). Various citations to Burke's letter to the CEO, in which Burke references other UPS employees, see Pl. SAMF ¶ 40, fail to provide the proper context.

Finally, to the extent the allegations were actually against the white employees as well, it appears UPS would not have told those white employees specifically about the allegations against *them*. See Doc. 99-17 at 114:15–115:5 ("Q: So because they were a named individual, you probably let them know what has been outlined in the allegations? A: It depends. We don't divulge like witness names or things like that or if other people are named in it, we only give them relevant information that they need to know. Q: At least notice of what alleged conduct has occurred so that they can respond to what their knowledge is concerning the conduct? A: Not exactly. We describe to them the incidents that happened then we try to ask our questions in a way that have them tell us what they believe happened. We try to take steps to avoid say bating of witnesses I guess in saying what we want or things like that.").

In sum, Plaintiff has failed to establish a *prima facie* case of race discrimination under Title VII and McDonnell Douglas.

44

### ii.   <u>Convincing Mosaic</u>

As noted, however, the inquiry does not end with a failure by the plaintiff under the <u>McDonnell Douglas</u> framework. Instead, Plaintiff can still proceed beyond summary judgment via the convincing mosaic theory.

On this point, Plaintiff essentially argues that the investigation UPS conducted was a sham. <u>See, e.g.</u>, Doc. 98 at 11.[39] In particular, Plaintiff contends that UPS violated its own policies by refusing to inform him of the accusations against him, that UPS informed the white managers named in Burke's complaint about the complaint without informing Plaintiff, that Bremerman was consistently hostile toward Lester, that Burke's allegations were "patently impossible when examined against the undisputed record," that Grant and McCusker used an anonymous concern that violated UPS policy, that UPS failed to interview a critical witness in Harvey Hill, a Black employee, that Plaintiff was never given an opportunity to respond to the allegations made by Burke, and that there was a pattern of discrimination against Black employees. Doc. 98 at 12–22.

In light of the fact the Court excluded Plaintiff's theory of conspiracy earlier, Plaintiff must proceed on his original theory that Bremerman, as the decisionmaker, acted with discriminatory intent. <u>See</u> <u>Ismael</u>, 161 F.4th at 760

---

[39] The Court essentially outlines the same arguments here as it did in the section dealing with retaliation.

(noting that a plaintiff will survive summary judgment under the convincing mosaic standard by showing in part that the decisionmaker acted with discriminatory intent (quoting Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011))); see also Doc. 78-10 at 113:20–114:5 ("Q: Okay. In addition to Mr. Bremerman, who else [do] you claim treated you unfairly and that it resulted in your termination? A: That's my stance. Q: When I ask you who else, to tell me 'That's my stance' is not – A: No one . . . That's Mr. Bremerman. Q: No one. Just Mr. Bremerman? A: Yes.").

Here, the record indicates that the Concerns Committee, not Bremerman, made the determination to terminate Lester. See, e.g., Doc. 78-21 at 7. Bremerman was not aware that Lester was investigated prior to being informed of the Concerns Committee's determination. See Doc. 78-11 ¶¶ 6–8. And Bremerman declined to overturn that determination. See Doc. 78-11 ¶¶ 6–8. Plaintiff does not point to any evidence suggesting that Bremerman—instead of the Concerns Committee—made the decision to terminate Lester. See Pl. resp. to Def. SMF ¶¶ 54–58. Nor does Plaintiff otherwise point to any evidence suggesting that the decisionmaker(s) in this case—the Concerns Committee—acted with discriminatory intent. See Taylor v. Farm Credit of N. Fla., ACA, No. 4:20-cv-59-AW-MJF, 2021 WL 5148022, at *5 (noting that a piece of evidence tending to show racial discrimination was "unconnected to" the decision-making process and thus not pertinent to the

46

convincing mosaic analysis). Finally, with respect to Plaintiff's remaining arguments on convincing mosaic, the Court points to its earlier discussion in the retaliation section (and its discussion of the "sham investigation," even though the undersigned found it late disclosed).[40] Even if the Court had not excluded the alternative "conspiracy" theory advanced by Plaintiff at summary judgment, the convincing mosaic would still fail, and Plaintiff has not proved intentional discrimination.

### iii.   **Mixed Motive Theory**

Plaintiff also asserts in his response brief that even if the investigation was not a sham, Plaintiff's termination was still racially motivated and mixed motive. See Doc. 98 at 22–24. Defendant replies that Plaintiff has not provided "any indication that race played a role in his termination." Doc. 109 at 12. In the mixed-motive context, a plaintiff need only produce evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) a protected characteristic was a motivating factor for the defendant's adverse employment action. See, e.g., Quigg v. Thomas Cnty. Sch. Dist., 814 F.3d 1227, 1232–33 (11th Cir. 2016).

---

[40] Because Plaintiff only references convincing mosaic once, the Court treats these his arguments in support of that theory as applying equally to his discrimination and retaliation claims. See supra note 30. Thus, rather than simply repeat the analysis on convincing mosaic undertaken above with respect to retaliation, the Court simply refers to that discussion here.

Plaintiff rests his mixed-motive theory on the idea that:

> The preemptive orchestration of Lester's termination, combined with the differential treatment of similarly situated White employees, and the procedural irregularities in the investigation (including the refusal to even explain to Mr. Lester what conduct he was accused of doing and what policy he allegedly violated), support an inference that race was a motivating factor.

Doc. 98 at 23.

But this entire string of allegations contains no citations to record evidence. As the Court has already discussed, Plaintiff has not actually identified any similarly situated white employee who was treated differently. Moreover, Plaintiff's allegation that there were procedural irregularities in the investigation finds no real support in the record. That argument is based on mischaracterizations of (1) Johnson's deposition testimony and (2) the UPS Code of Business Conduct. See Doc. 98 at 18, 20. Thus, while these allegations—if they found support in the record—could have possibly supported an inference that race was a motivating factor, the fact of the matter is they do not. The allegations therefore fail to create an issue of fact and fail to support a mixed-motive theory of discrimination.

In light of the above, it is **RECOMMENDED** that Defendant's Motion for Summary Judgment with respect to Plaintiff's discrimination claim be **GRANTED**.

### c. **Breach of Contract**

Plaintiff's final claim is for breach of contract. See Doc. 1 ¶¶ 104–13. Defendant argues for summary judgment on Plaintiff's breach of contract claim because Lester failed to substantiate and confirm that incurred expenses were for legitimate business purposes before paying them—a requirement under UPS policy. See Doc. 77-1 at 26. As far as the Court can tell, Plaintiff does not address his breach of contract claim at any point in his response brief and thus it is abandoned. See generally Doc. 98; see, e.g., Road Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp., 10 F.3d 1563, 1568 (11th Cir. 1994) (noting that the court could "properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment." (citing Lazzara v. Howard A. Esser, Inc., 802 F.2d 260, 269 (7th Cir. 1986) (holding that a ground not pressed in the district court in opposition to a motion for summary judgment is to be treated by the district court as abandoned))).

Because Plaintiff has abandoned his breach of contract claim at the summary judgment stage, it is **RECOMMENDED** that Defendant's Motion for Summary Judgment with respect to Plaintiff's breach of contract claim be **GRANTED**.

### Conclusion

Plaintiff's Motion to Strike [105] is **DENIED**.

Defendant's Notice of Objection [111] is **GRANTED** to the extent explained above.

It is **RECOMMENDED** that Defendant's Motion for Summary Judgment be **GRANTED**.

The Clerk is **DIRECTED** to terminate the reference of this case to the undersigned Magistrate Judge.

**IT IS SO ORDERED, REPORTED and RECOMMENDED** this 26th day of January, 2026.

Anna W. Howard
United States Magistrate Judge